REITZ, RECEIVER, *v.* NOWLIN.

4-4837

Opinion delivered December 6, 1937.

*Arnett & Shaw* and *Warner & Warner,* for appellants.

*Thomas Harper* and *Geo. W. Johnson,* for appellees.

HUMPHREYS, J. Appellees were laborers, some thirty-three of them, engaged in mining coal for the Queen Excelsior Coal Corporation, at the time it ceased to operate on March 4, 1936. Said company failed to pay the laborers and they brought this suit to recover the respective amounts due them and sought to enforce a laborer's lien on the property by attachment proceedings. All the property used in and about the mine including one inside hoist and one C. H. 8 Sullivan long wall machine was seized by the sheriff under the writ of attachment sued out by appellees.

The receiver of the Blue Ribbon Corporation intervened in the suit claiming that the Blue Ribbon Corporation owned the two pieces of equipment described above and prayed that the sheriff be ordered by the court to turn the equipment described above, consisting of two machines, over to him.

The Jewel Mining Company intervened in the suit alleging that it owned a certain coal lease leased to the Blue Ribbon Corporation and that under the terms of the lease all equipment, machinery and personal property belonging to the Blue Ribbon Corporation had been pledged to it to secure royalties due it amounting to about $2,500 at the time the mines were closed down; that the two pieces of equipment described above belonged to the Blue Ribbon Corporation and it prayed that the court order the sheriff to turn said pieces of equipment over to it to be sold and applied on the royalties due it.

Interventions were filed in the suit by Jackson, Hunter & Gould Co., A. J. Boone and Bruce-Rogers Co., claiming certain properties described in their respective mortgages as prior to the liens of appellees.

The issues joined by the pleadings and the evidence responsive thereto were submitted to the trial court on February 6, 1937, resulting in the rendition of judgments in favor of appellees for the respective amounts found to be due them and a first lien was declared upon the property not included in the mortgages held by interveners Jackson, Hunter & Gould Co., A. J. Boone and

Bruce-Rogers Co., and rendered a judgment in favor of the mortgagees for the respective amounts due·them, and declared a first lien in their favor on the property described in their mortgages, but declared the lien in favor of Bruce-Rogers Co., subject to the lien of Jackson, Hunter & Gould Co., and A. J. Boone.

The intervention of appellants, George Reitz, receiver, and the ·Jewel Mining ·Co., were dismissed for the want of equity, from which judgment of dismissal they have appealed to this court.

Bruce-Rogers ·Co., excepted to that part of the decree giving priority .to A. J. Boone's mortgage and from that particular part of the decree have duly prosecuted an appeal to this court.

The mortgages were all chattel mortgages and the mortgage of A. J. Boone was filed in the circuit clerk's office prior in point of time to the mortgage of Bruce-Rogers Co.  The following indorsement appears on the back of the Boone mortgage:

·"Chattel Mortgage
With Power of Sale

L. L. Bianchi

Mortgagor...........

To

A. J. Boone

A. J. Boone

Mortgagee...........

This instrument is to be filed, but not recorded.

Mortgagee...........

Filed this 26th day of Aug................
1933, at 4 o'clock...........minutes p. m. and

entered on page................:Book................of.
Minutes of Mortgages.
      Oscar Durden

-------------------------------------------------

                          Clerk and Recorder.
      R. H. Beach
      By................................................................D. C.''

Bruce-Rogers Co., contends that the indorsement on the Boone mortgage as set out above is not such a substantial compliance with § 7384 of Crawford & Moses' Digest (§ 9438, Pope's Digest) as to give the Boone mortgage priority over its mortgage describing the same property. Section 7384 of Crawford & Moses' Digest (§ 9438, Pope's Digest) is as follows:

''Whenever any mortgage or conveyance intended to operate as a mortgage of personal property, or any deed of trust upon personal property, shall be filed with any recorder in this state, upon which is indorsed the following words, 'This instrument is to be filed, but not recorded,' and which indorsement is signed by the mortgagee, his agent or attorney, the said instrument when so received shall be marked 'Filed' by the recorder, with the time of filing upon the back of said instrument; and he shall file the same in his office, and it shall be a lien upon the property therein described from the time of filing, and the same shall be kept there for the inspection of all persons interested; and such instrument shall thenceforth be notice to all the world of the contents thereof without further record.'' A substantial compliance with the statute is all that is necessary in order to give notice to third persons of the existence of the mortgage by filing only and to constitute a lien on the chattels therein described in favor of the mortgagee. *State* v. *Smith,* 40 Ark. 431; *Price* v. *Skillen,* 60 Ark. 112, 29 S. W. 37. A majority of the court are of opinion that the signature of the mortgagee, A. J. Boone, appearing above the printed indorsement with a line drawn from the name to the dotted line under the indorsement is a substantial compliance with the statute and was sufficient to give notice to third persons of the existence of

the mortgage by filing only and that it constituted a lien on the property described therein from and after the date of filing the mortgage. The writer and Mr. Justice BAKER do not concur in the view of the majority in this respect.

The issue involved on this appeal between George Reitz, receiver of the Blue Ribbon Corporation, and the Jewel Mining Company, appellants herein, and J. T. Nowlin *et al.,* appellees herein, is whether the hoist and coal cutting machine belonged to the Blue Ribbon Corporation or to the Queen Excelsior Coal Corporation at the time the same was seized by the sheriff under the writ of attachment sued out by said appellees. If, at that time, said two pieces of machinery were owned by the Blue Ribbon Corporation, the decree of the chancery court ordering them to be sold and the proceeds applied to the satisfaction of said appellees judgments is incorrect, but if at that time said property belonged to the Queen Excelsior Coal Corporation, the decree of the chancery court is correct.

The testimony is undisputed that the Blue Ribbon Corporation and the Queen Excelsior Coal Corporation were two units in a chain of coal mines consisting of four units. The four coal mines were under the management of C. H. Cousins. The stockholders in each of the units were practically the same persons and a number of them were related to each other. The property used in each coal unit was shifted from one coal mine to the other as it was needed by one or the other. There is testimony in the record tending to show that about two years before the mines closed down they were bought initially for use by the Blue Ribbon Corporation, but that the inside hoist had been taken over to the Queen Excelsior Coal Corporation on two occasions. The last time it was taken over was in September, 1935, and it was used continuously from that date by the Queen Excelsior Corporation until March 4 when the mine closed down. Some of the testimony tends to show that it was taken from the Blue Ribbon mine to the Queen Excelsior mine without any intention of being returned to the Blue Ribbon

Corporation. Other testimony tends to show that it was to be returned at some indefinite time in the future. The cutting machine was taken over to the Excelsior mine about the first of January, 1936, and continuously used by the Excelsior Company until the mine was closed down. Some of the testimony tends to show that the machine was sent by the Blue Ribbon Corporation to the electric shop in Fort Smith in a torn down condition so that it might be repaired, and that the repairs cost something like $500 or $600 which was paid by the Excelsior Coal Company. Some of the testimony tends to show that the machine was sent over to the Excelsior Company without any intent of taking it back to the Blue Ribbon Corporation, and some tends to show that it was loaned by the Blue Ribbon Corporation to the Queen Excelsior Corporation as long as it might need it and without any definite time being fixed for its return. The testimony as to the ownership of these two pieces of machinery is so conflicting that we are unable to say the chancellor's finding that it belonged to the Queen Excelsior Company at the time the mine was closed down is contrary to a clear preponderance of the testimony. Especially is this true in the light of the circumstances that the stockholders in each of the four units were practically the same, and that the four units were managed by one person, and that the equipment used in each mine was shipped about from place to place.

The decree of the chancellor, therefore, is in all things affirmed.