LASER v. STATE, EX REL. MCKINLEY, COMMR. OF LABOR.

4-5563                                    132 S. W. 2d 193

Opinion delivered October 9, 1939.

*George O. Patterson* and *E. H. Patterson,* for appellant.

*G. B. Segraves, Jr.,* for appellee.

*Linus A. Williams,* for intervener.

946

MEHAFFY, J.   The appellant was, and had been for
a number of years, the owner of a coal mining plant con-
sisting of tipple, motors and machinery ordinarily and
customarily used in mining coal in what is known as the
Spadra field, Johnson county, Arkansas.  The mine is
approximately two miles south of Clarksville, and has
been known as the Sterling Coal Company.  The appel-
lant Laser, however, was the owner of same.

On July 1, 1937, Laser, by written lease, leased to
J. E. Harding, Dick McAnally, Clint Huff, Walter Green,
A. A. Deavers, and V. T. Collier for a period of three
years, the entire mining plant which he owned, consisting
of the equipment used in connection with the operation
of the mine, in order to permit the lessees to engage in
the operation of the coal mine.  The lease provided for
a royalty of 40 cents per ton on all coal mined, payable
on the 15th day of each month for the coal mined the
preceding month.  On August 2, 1937, the lessees organ-
ized themselves into a corporation known as the James-
town Mining Company, and on August 7th the mining
plant and equipment was assigned by the original lessees
to the corporation, Jamestown Mining Company.  This
assignment was by and with the consent of appellant
with the understanding that the lessees individually
would not be relieved from the payment of all royalties
due on coal mined, as provided in the original lease.
After obtaining this assignment, the Jamestown Mining
Company engaged in the operation of the mine from
August 7, 1937, until January 15, 1938, at which time it
was unable to meet its payroll and closed down.  On
March 3, 1938, the appellees, Bill Sefik and 47 other
persons, filed this suit in the Johnson chancery court in
the name of the state of Arkansas, upon the relation of
the Commissioner of Labor, and claimed a lien upon all
of the mine and equipment used by them in performing
the labor during the period for which they were unpaid.
Affidavit for enforcement of the lien was filed.  The
complaint set out in detail the amounts due each, and
also an itemized list of the machinery used by them in
performing their labor.

The appellant, Laser, filed a demurrer to the complaint and affidavit, which was overruled, and Laser then filed an answer setting up that he was the owner of the property; had leased it to six individuals who had later leased it to the corporation, which was the employer of appellees, and he denied any connection whatever with the corporation or its conduct or operation of the mine.

John Cline, doing business as Clarksville Welding and Machine Works, filed an intervention claiming a lien on certain items of machinery because of repairs made to it under the contract with the corporation during the time it was engaged in the operation of mines.

The court entered a decree in favor of appellees, laborers, and in favor of intervenor Cline, giving them judgment against the Jamestown Mining Company for the amounts due, and also giving them a lien upon all the machinery used by them in the mine while performing their labor.

The appellant appealed from the decree awarding appellees a lien on the machinery and equipment. The case is here on appeal.

There is practically no dispute about the facts. The appellant, Laser, testified that he was the owner of the property and had been operating it since 1932; operated it under the name of the Sterling Coal Company, but he was the individual owner; he leased it to the individuals above named, and says he had no control over the operation of the mining company or the lessees that he leased it to originally; he identifies the machinery described as machinery belonging to him; that the mining company advised him, as owner, that they could not operate the mine any longer, and that if he wanted to protect his property he would have to take it over. The corporation surrendered the lease on January 31, 1938. He testified that he had been out approximately $450 in protecting the property; identified the assignment of the lease to the corporation, and the lease was introduced in evidence. He also testified that under the terms

of the lease he was to have the first opportunity to sell the coal for the corporation; that if he could not sell it they could sell it any place they desired; that his right to sell the coal was exclusive, but that the lessees could sell their coal anywhere if he could not sell it, and would give him only the royalties; that he purchased the coal outright from the mining company; that he was to receive a commission of 25 cents per ton on the coal he sold, in addition to his royalties. At the time he leased the property, he was engaged in the coal jobbing business, and had arranged to open his office in Minneapolis, Minnesota; that he not only handled coal for the Jamestown Mining Company, but other mines in the Spadra field and the whole southwestern field of the United States on a commission basis; that he had the exclusive right to sell the coal produced by the corporation and was to receive on all coal sold for it an additional sum as sales agent over and above the royalties due him under the lease; that the Jamestown Mining Company was a corporation, but he did not own any stock in it; that the Sterling Coal Company is a trade name which has been used by him; that he owns personally the Sterling Coal Company. He did not own the coal; it belonged to King and Clark Heirs and his mother; that he had a lease on the coal; that prior to the time he leased it, he operated the mine himself; the mine had been operated since 1904; neither Laser nor any of his family ever owned any stock in the Jamestown Mining Company.

J. E. Harding, one of the original lessees, testified corroborating the testimony of Tom Laser. Harding also testified that Laser was the exclusive sales agent; that Laser sometimes paid the power bills and deducted it from the amount the coal company had coming from coal he had sold.

The articles of incorporation were introduced, and also a copy of the lease, with the assignment.

The appellant was recalled and testified that he did not know where the office of the Jamestown Mining Com-

pany was located; that their books and payroll were kept at different times in an office that he maintained in Clarksville; that the corporation asked permission of him to use his office for their books because Miss Susie Cunningham, the bookkeeper of the corporation, was in that office; she did not work for him; the bookkeeper of the corporation made out the payroll in his office.

J. E. Nichols testified that he was employed by Tom Laser and the Southwest Coal Sales Organization of Minneapolis, owned by Laser. Miss Cunningham kept the company's books in his office at Clarksville; he had no control over her; the corporation asked the privilege of being permitted to keep the company's books in his office, which permission was granted. He testified that the payrolls and records were kept in the office space that he permitted Miss Cunningham to use.

The chancellor held that the laborers were entitled to a lien under § 9349 of Pope's Digest, which reads as follows: "Any person or persons working in any mines of the state of Arkansas, or in any quarries, either stone or marble, shall have a lien on the output of any such mines or quarries for the amount due for such work, and, in addition thereto, his lien shall attach to all the machinery, tools and implements used in such quarrying and mining, such liens to be enforced in the manner now provided or as may hereafter be provided for the enforcement of laborers' liens."

It is appellant's contention, first, that the appellees are not entitled to a lien under § 8905 of Pope's Digest. That section provides for liens on mines, gas and oil wells, buildings, supplies and equipment; but the court held that they were entitled to a lien under § 9349 of Pope's Digest.

The first case cited and relied on by appellant is *Reitz, Receiver, v. Nowlin*, 195 Ark. 16, 110 S. W. 2d 690. In the first place, the court in the case relied on did not construe the sections involved here; and the court stated: "The testimony as to the ownership of these two pieces of machinery is so conflicting that we are unable to say

the chancellor's finding that it belonged to the Queen Excelsior Company at the time the mine was closed down is contrary to a clear preponderance of the testimony.''

Appellant then calls attention to the case of *Estep et al.* v. *Blue Ribbon Co.,* 177 Ark. 83, 9. S. W. 2d 331. That case holds that the act giving a lien to miners does not make such lien superior to the lien of a chattel mortgage.

We think, however, that none of these cases cited by appellants is controlling here, for the reason that the evidence showed that the mine was operated for the benefit of appellant Laser himself. The lease provides not only that he shall have 40 cents royalty on each ton, but that he shall have the exclusive right to sell all the coal mined. He, therefore, has control of the entire output, and the statute gives the laborers a lien on the output of the mine, and this entire output, under the lease, was under the control of the appellant. The corporation could not sell a ton of coal unless they were permitted to do so by appellant. If he had control of the entire output, and the evidence shows conclusively that he did, the mine was operated for his benefit as much as for the corporation. Certainly it would not be permissible for him to take the output of the mine, on which the laborers had a lien, and operate the mine in the manner in which this one was operated and prevent the laborers from having a lien to enable them to collect their wages. In addition to controlling the entire output, the evidence shows that the bookkeeper of the corporation occupied a room in Mr. Laser's office; the books were kept there, and we think the evidence clearly shows that the manner in which the mine was operated was· for the benefit of the appellant; that is, he operated the mine in this way and never at any time, except by his own consent, did anyone else have a right. to sell the output of the mine. The evidence shows that appellant was in the coal business, engaged in selling coal, and in the lease executed by him, he retained the exclusive right to sell all of the coal. It was provided in their contract that if Laser could not sell the coal, then the corporation might sell it; but even

then, the contract provides that Laser shall have his 25 cents per ton and his 40 cents per ton royalty. In other words, we think the arrangement just a method of operating the coal mine by appellant himself. If this could be done, then the owner could retain all the profit, all the income of the mine, and deprive the laborers of their lien under the statute. There seems to be no serious contention as to the lien of the intervener for repairing machinery.

Our conclusion is that the chancellor's decree is correct, and it is affirmed.