BATES COAL & MINING COMPANY v. MANNON.

4-6951                                                  168 S. W. 2d 408

Opinion delivered February 8, 1943.

*Bates, Poe & Bates* and *R. A. Young, Jr.,* for appellant.

*Hugh M. Bland,* for appellee.

ROBINS, J. This is an appeal from a judgment entered on the verdict of a jury in favor of each of the appellees for $1,500 against the appellant for damages growing out of the death of nine coal miners caused by an explosion in a mine on August 27, 1940, at Bates, Scott county, Arkansas. Separate suits were brought by each of the appellees who were, in seven cases, the widows, and in two cases the administrators, respectively, of the decedents against the appellant and two other corporations and certain individuals, and all the cases were

consolidated by order of the lower court. During the trial nonsuit was taken as to two of the individual defendants and one of the corporate defendants, and the case was submitted to the jury to determine the liability of the appellant, Bates Coal & Mining Company, Arthur Raines and Ben Bedwell. The jury returned a verdict against only the appellant.

Four grounds for reversal of the judgment of the lower court are here urged by appellant, to-wit: First, that there was no substantial evidence that the appellant was operating the mine at the time of the explosion; second, that there was no substantial evidence upon which to base a finding that the explosion and consequent death of the miners was caused by the negligence of the operator of the mine; third, that the court erred in giving instruction No. 9 at the request of the appellees; and fourth, that the court erred in permitting the jury to consider the doctrine of *res ipsa loquitur* in determining whether there was negligence on the part of the appellant which caused the explosion. These contentions will be considered in the order set forth above.

## I.

The land upon which the mine was located was owned by Mrs. Waring of Joplin, Missouri. She leased it to the New Bates Smokeless Coal Company, by which it was leased to the appellant, Bates Coal & Mining Company.

A written lease under which the property was sublet by the Bates Coal & Mining Company to Arthur L. Raines, trustee of the "Scott County Development Company" for a term of nine years, with an option for an extension of an additional ten years, was prepared and appears to have been signed and acknowledged by the appellant on June 12, 1940. It was not signed or acknowledged by the lessee, Arthur L. Raines, until September 7, 1940, about two weeks after the explosion which caused the death of nine miners, and was not recorded until two days later. Under the terms of the lease it was required that within thirty days after its execution an inventory of all the mining property should be made by representatives of both parties, and that

this inventory, when made, should be attached to and become a part of the lease. No such inventory appears in connection with the lease, and Miss Virgie Leatherwood, the bookkeeper at the mine, said she knew nothing about such an inventory being taken. She further stated that she did not know who owned the machinery of the mine. By paragraph ten of the lease it was provided that the lessor might cancel the lease for nonpayment of the royalty or for noncompliance with the terms of the lease, among which was the undertaking on the part of the lessee to operate the mine "in good and workmanlike manner with due regard to the safety of the employees . . . and in accordance with the laws of the state of Arkansas." There was no proof to show that there was ever any such concern as the "Scott County Development Company," and the managing officer of the appellant, who had executed this lease on behalf of the appellant, testified that he knew nothing of the "Scott County Development Company," and that he understood the mine was to be operated by Raines and Bedwell, but that Bedwell did not wish his name to appear as one of the lessees. The testimony tended to establish that Raines and Bedwell, either as lessees or otherwise, took charge of the coal mine about the first of August, 1940, and began to operate it, and that some officials of the miners' union were advised that Raines and Bedwell were operating the mine, and that the appellant was not. It was not shown by the testimony that this information ever reached any of the miners who were killed.

Statements showing the amount due the miners for the work done during the first half of August, apparently prepared about the last of August, indicated that the mine was being operated by the Bates Coal Corporation, and it appears that on, or about, August 9, 1940, a payroll bond required by § 8543 of Pope's Digest, to guarantee payment of wages due to miners, was filed by the Bates Coal Corporation, as principal, with Bedwell and Raines, as sureties. According to the undisputed evidence, the Bates Coal Corporation did not come into existence as a corporation until October 9, 1940, or long after the ex-

plosion occurred. Bedwell and his wife and Raines and his wife were the only stockholders in the Bates Coal Corporation. The evidence clearly established that neither Bedwell nor Raines had assets of any substantial character, although they had sworn, in qualifying for the payroll bond, that they were worth $7,500. Bedwell and Raines testified that they were each to receive a salary of $500 a month for their work in supervising the mine, and the testimony showed that Bedwell received a check for $247.50 and that Raines received a check for $245.50 drawn by the Bates Coal Corporation on August 31, 1940. Each of these checks bore the notation "Wages half ending August 15, 1940."

This mine, with the machinery of the appellant used in its operation, was property of considerable value. During the summer preceding the explosion, which occurred on August 27, 1940, the appellant spent from $4,000 to $6,000 in improving and developing the mine. Since Bedwell and Raines were without means, the only source from which the payroll of the mine could be met was the selling of the coal, which naturally could not be effected until some time after it was mined. Witnesses for the appellant testified that a loan of $2,600 was made by the appellant to Bedwell and Raines to be paid out to the miners. This money was not placed under the control of Bedwell and Raines, but was deposited in a bank account called the "Virgie Leatherwood Special Account." It was explained by witnesses for the appellant that this money was to be used only for making loans to miners, and it was charged that it was kept in this special account in order to conceal the fact that the operator of the mine was lending his employees money and charging them an exorbitant rate of interest, and that the appellant was to get half of the profits made out of the lending of this money to the miners. There was apparently some contradiction in the testimony of the witnesses on behalf of the appellant as to the liquidation of this "Virgie Leatherwood Special Account." Miss Leatherwood testified that she did not know whether the appellant had ever gotten this money back or not, and she stated that when the Bates Coal Corporation ceased operations it

owed the appellant $6,252.97. Raines testified that he did not know whether this loan was repaid to appellant or not. On the other hand, the managing officer of the appellant testified that the loan had been repaid, but how and with what funds it was repaid was not disclosed.

In the case of *Laser* v. *State, ex rel.*, 198 Ark. 945, 132 S. W. 2d 193, it appeared from the evidence that Laser, the owner of a coal mine, had leased it to six individuals by written contract, and that these individuals had later sublet the mine to a corporation by which it was operated and by which certain coal miners were employed. The corporation failed to pay the miners their wages, and a suit was brought by them in the chancery court to enforce a lien against the machinery and equipment belonging to Laser. In the consideration of that case it seemed to be assumed that, if Laser owned the machinery and equipment, but was not operating the mine, the miners would not be entitled to a lien thereon. Under the terms of Laser's lease he had no control over the mine, nor interest in the operation thereof, except to receive the royalty of a certain sum for each ton of coal mined, and to act as agent of the lessees in selling the coal if he could find a market therefor, for which he was to receive a stipulated commission. The chancery court held that the miners were entitled to a lien on the property of Laser and the Supreme Court affirmed the chancellor's decision. After reciting the circumstances established by the evidence this court, in its opinion, said: "In other words, we think the arrangement just a method of operating the coal mine by appellant (Laser) himself." In that case, as far as the documents showed, Laser had apparently divested himself of any control over, or liability growing out of, the operation of the mine. Nevertheless, his property was held liable for the miners' wages on the theory that he was, in reality, the operator of the mine, in spite of the written evidence to the contrary. We believe the principle underlying the decision in the Laser case is controlling in this case, and that the failure of the parties to have the lease completed by the signature of the lessee or to record it until after the explosion occurred, the lack of proof of the transfer

of the lease from the lessee named in the lease to anyone else, the fact that the lease was made to a trustee for a non-existent concern and of which the appellant's managing officer had no knowledge, the fact that the Bates Coal Corporation, which, as reflected by the payroll bond and the wage checks, was operating the mine, did not come into existence for more than a month after the explosion, the fact that the appellant, without security, loaned a rather large sum of money for the purpose of making advances to the miners to two men of very small financial worth, and the uncertainty and contradictions in the testimony about the repayment of this loan, were all facts which, when considered with the other circumstances shown by the evidence, were sufficient to justify the jury in finding that, at the time of the explosion, the mine was being operated by the appellant.

## II.

Was there substantial evidence upon which the jury could base a finding that the explosion was caused through negligence on the part of the operator of the mine? The testimony showed that this mine was dangerous, on account of the fact that, in removing coal, pockets or feeders of gas were encountered and this gas had a tendency to flow out into the mine. For the purpose of ventilating the mine and ridding it of the gas encountered in the mining operations a ''booster fan'' was placed in the mine, but, according to the testimony of witnesses on behalf of the appellees, the ''booster fan'' was improperly placed, because it was set at the bottom of the wall of the tunnel instead of being at the top where the gas, being lighter than air, collected, and because it was placed so far back in the mine that the current of fresh air did not reach it, with the result that the ''booster fan,'' instead of bringing fresh air in and blowing the foul air out, simply caused bad air to circulate about without ridding the mine thereof. The testimony on behalf of the appellees also tended to establish that the mining machine which was being used at the time of the explosion was an antiquated one, having been made about the year 1913, and that it was dangerous because the

mechanism for controlling the electric motor which operated the machine was set on top of the machine and was not covered in any way. One of the witnesses testified that it was not a "permissible machine." When the control lever was moved, according to appellees' witnesses, there was frequently a large electrical spark which, of course, was capable of igniting gas. It was shown by the testimony that the State Mine Inspector had·inspected the mine a short time before the explosion, and among other recommendations for the safety of the miners he made was that all open switches be enclosed. Whether this recommendation was intended to cover the switch controlling the electrical mechanism of the mining machine was not clear from the evidence, but apparently this control mechanism was never enclosed, and was in a condition said by appellees' witnesses to be dangerous at the time the explosion occurred. That the explosion was a very violent one and such an explosion as could have been caused by a mixture of gas, air and coal dust being set off by an electrical spark is apparently undisputed. Every man working in the mine at the time was killed and the bodies of some of them were badly burned. It was the duty of the operator of the mine to use due care in furnishing a reasonably safe place to its employees in which to perform their duties and reasonably safe machinery with which to work, and we cannot say, in the light of the testimony pointed out above, that there was a lack of substantial testimony on which the jury might base a finding that the explosion was caused by the failure of the operator of this mine to use the required degree of care in providing a safe place for its employees to work in and with safe machinery with which to work.

## III.

It is urged by appellant that the lower court erred in giving instruction No. 9, which is as follows:

"9.   The defendants have interposed what in law is known as the defense of assumed risk. This defense arises from the contract of employment itself and is a part of the contract that the employee assumes the or-

dinary risks incident to the employment, and those extraordinary risks that are so open and obvious as to be at once discoverable to one of ordinary intelligence.

"You are, therefore, instructed that an employee entering the employment assumes the ordinary risks and hazards incident to his employment, and those extraordinary risks that are so open and obvious in their nature to be discoverable to one of ordinary intelligence, and so, if you find from the evidence that the decedents were killed due to one of the ordinary risks and hazards of their employment, or to extraordinary risks and hazards that were so open and obvious as should have been discoverable to one of ordinary intelligence, then you will find for the defendants.

"You are further told, in this connection, that the decedents did not assume the risk of the negligence of the defendants, if any, unless they knew of such negligence and appreciated the dangers thereof, and if you find from a preponderance of the evidence that defendants failed to properly ventilate said mine and failed to furnish the decedents with a safe place in which to work, safe tools, appliances and machinery with which to work, and that said failure was negligence and that said negligence, if any, was the proximate cause of the deaths of the decedents, and you further find that decedents exercised ordinary care for their own safety and did not assume the risk, then your verdict should be for the plaintiffs."

The first objection urged here against this instruction by the appellant is that there was no evidence to show what the cause of the explosion was, and it is suggested that one of the miners might have struck a match causing the gas to ignite. There is no testimony whatever to the effect that any miner did strike a match. The lower court did not, in this instruction, assume to tell the jury what the cause of the explosion was, but merely authorized the jury to find a verdict in favor of the appellees if the jury should find from the evidence that the operator of the mine negligently failed to ventilate said mine properly, and negligently failed to pro-

vide the decedents a reasonably safe place in which to work, and negligently failed to provide safe tools with which to work, and that such negligence was the proximate cause of the death of the decedents, while the decedents were in the exercise of ordinary care for their own safety and had not assumed the risk. Appellant also complains that this instruction was erroneous because there was no testimony in the record to show that decedents were exercising ordinary care for their own safety. Under the law, the burden of proving contributory negligence causing or contributing to a personal injury is always upon the person asserting such contributory negligence, and the appellant is certainly not in any position to complain of that portion of this instruction which required the appellees to prove the decedents were not guilty of contributory negligence. "The burden of proving negligence is on the plaintiff, and of proving contributory negligence is on the defendant, unless it is shown by the testimony of the plaintiff." *Hot Springs Street Railroad Co.* v. *Hildreth,* 72 Ark. 572, 82 S. W. 245; *Lion Oil Refining Company* v. *Smith,* 199 Ark. 397, 133 S. W. 2d 895. This latter objection was the only specific one made in the lower court by counsel for appellant, and it was not well founded. This instruction, taken as a whole, was not an incorrect declaration of the law applicable in this case.

## IV.

It is finally urged by counsel for appellant that the trial court erred in permitting the jury in this case to consider the rule of *res ipsa loquitur.* We have failed to find in the record any instruction given by the lower court under which this rule was expressly submitted to the jury, and, since, as we have pointed out, there was substantial evidence to justify a finding by the jury that the explosion was caused by the negligence of the operator of the mine, we deem it unnecessary to consider the contention of the appellant as to error of the lower court in submitting the theory of *res ipsa loquitur* to the jury.

No prejudicial error being shown, the judgment of the lower court is affirmed.

McHaney and Holt, JJ., think that a rehearing should be granted.